(Clark County, O., Probate Court.)
No. 50.

IN RE ESTATE OF WM. ROTH.

---

(1). The right of a widow to a year's allowance rests upon the existence of the family relation.

(2). The establishment of the mere fact that the marriage relation once existed and was never legally severed will not be sufficient to establish the widow's claim to the year's allowance.

(3). The claimant must show in addition that the marriage relation actually existed at the time of decedent's death, or if it did not exist, that it was against her wish, and without her fault.

(4). A widow may, by contract made during the lifetime of her husband, release her right to a destributive share of his estate.

(5). Only a widow or widower can commence the action to assign dower, and if the widow or widower die before such action is begun, the real estate passes to the heir free from any dower claim.

---

ROCKEL, J.

In 1865, William Roth, the deceased, was married in Germany to Amelia Schwappacher. A son was born to them, who is still living. They did not live very happily together. Just what the reason was, has not been very clearly shown. About the year 1870 or 1871, William Roth left his wife in Germany and came to the United States. He also left all his property there, which amounted to about $100.00 which his wife Amelia received. It was rumored that he eloped with another woman, but this was not proven. He came to Pennsylvania and remained there some two years, and is claimed to have married his second wife. Thereafter he and his second wife came to Springfield, Ohio, where they lived as man and wife until she died. About two years after her death he married Margaret Roth, who is still living. William Roth's conduct to his second and third wives and generally, was that of an exemplary German citizen. He was industrious and frugal, and with the aid of his American wives accumulated several thousand dollar of property.

So far as we are informed neither of his American wives knew anything of the German wife until about two years ago.

After Roth left Germany her parents assisted his wife in the maintenance of their children. Just what this wife's conduct was after he left her or before, so far as being a moral, chaste wife, is not shown otherwise than she bore two illegitimate children, after he left her.

Whether she ever made any effort to find out where her husband was, or displayed any anxiety to continue the married relations, does not appear.

Indeed it is very doubtful if she would ever have come to the United States at all, except through the persuasion of her son. This son through his father's relatives had discovered where his father resided, and also learned that his father had accumulated some property, and came to America. After he got here he wrote to Germany and persuaded his mother to come here, saying that if she came she could get some of his father's property.

Thereafter, more it seems to get a share of his property, than to continue the marital relations, she came to America.

About the first thing she did was to enter a suit for alimony. While this was pending, having had some difficulty with the son, she wanted to return to Germany as she said to live with her other children.

In the absence of the attorneys on both sides, the parties, through a German friend, met and their difficulties were adjusted by the following contract.

"I the undersigned, Amelia Roth, nee Schwappacher, do hereby, certify that I have received from William Roth, one hundred and fifty dollars, ($150.00) as payment in full of all my accounts and claims upon him. I Amelia Roth do hereby-absolutely renounce and waive all matrimonial rights and legal claims upon the said William Roth. Further I promise to annul my suit against William Roth now pending in the court of common pleas, Springfield, Ohio, and never to enter a law suit against him nor raise any claim whatever.

Springfield, Ohio, April 10th, 1895.
                    Amelia Roth."

L. H. Lorenz }
Phillip Holl  } Witnesses."

The money was paid over to Amelia Roth, to-wit: $150.00, and a ticket was purchased for her to Germany. She started on her way; got as far as Baltimore, and then returned, and attempted to repudiate the contract. She did not remain however very long, but went back to Germany and remained there until her death.

I think it is clearly shown that she willingly signed this contract, and as she was a woman of education, it is presumed she understood its purport. One significant thing appears, that while these negotiations were pending she made no claim on William Roth, either legal or moral. She did not assert that William Roth deserted her without cause. She rather acted as if the separation was her fault as much as his.

On December 6, 1895, William Roth died, cohabiting with Margaret Roth as his wife. His will was probated, and L. H. Lorenz qualified as executor. Appraisers were appointed to appraise the personal estate.

In their return of appraisement they recognize Margaret Roth as the widow of William Roth, and set off to her year's support the sum of $350.00.

To this action of the appraisers in setting this amount off to Margaret Roth, Amelia Roth excepts, and claims that she, never having been divorced from William Roth, is his widow in law, and entitled to said $350.00.

Since these exceptions were filed, Amelia has also died. But by consent of parties the case is to be treated as revived in the name of her personal representatives.

Sections 6040 and 6041, require that the year's maintenance be set off to the widow and minor children of the decedent.

Amelia Roth having been married to the decedent and never divorced, is legally the widow of said William Roth.

This being true, the first question to arise, is: Can the court consider any other matter, or will this fact alone entitle her to the year's allowance provided by sections 6040 and 6041?

The provisions of our law are not very plain upon this proposition. It is generally presumed that but one person will claim to be the widow of a deceased person, and the legislature

always speaks of such person as the widow &c.

Section 6043 provides that the court may increase or decrease the allowance, but does not seem to give the court original jurisdiction to fix the allowance.

But in a case like the present, as the court must act upon the return of the appraisers, this matter comes in an indirect way, in determining whether the appraisers have properly discharged their duty.

The object and purpose of the year's allowance is to furnish the means of support to the family of a deceased person, for a short time, until the estate may be ready for distribution, or if there is no estate for distribution, until some other means of support is found.

It always seems to have its basis upon the existence of a family relation.

In the case at bar the legal wife of William Roth, is not the person with whom he sustained the family relations at the time of his death. Thus, if judged by the words of the statute alone, Amelia Roth is entitled to the set offs.

If we are to consider the objects and purposes of the year's allowance, Margaret Roth is the proper one to have this allowance.

Which shall prevail? Both cannot.

Whatever may have been the faults of William Roth, Margaret was guilty of none. The illegal relation she sustained to William Roth was not with her knowledge.

Until the appearance of Amelia she knew of no such previous relation. William Roth had lived here for many years with another woman known as his wife until her death. The family relation between William Roth and Amelia had not existed for at least twenty-five years before his death. This is one of the few cases where truth is almost as strange as fiction. There have been some cases where even a legal wife was refused the year's allowance. Thus in Kersey v. Bailey 52 Me., 201 where it is said.

"The appellant, though the legal wife of the deceased, had not lived or cohabited with him for more than forty years. True he had deserted her, but subsequently she, supposing him to be dead, married another man with whom she lived and cohabited as man and wife, for thirty years and more, and until his decease.

"The intestate, on his return to this state many years ago, finding that she had formed new ties, allied himself to another woman by whom he had a family, and in connection with whom the little property left by him at his decease would seem to have been accumulated.

"The appellant, entangled with her new connection, does not appear to have made any claim upon him for support, during the long time that had elapsed after his return to this state before his decease. She lost nothing by his death which she had not before possessed.

"In fact there seems to have been a tacit relinquishment by each of all claims upon the other for more than a quarter of a century. It is plain she contributed nothing by her industry and prudence to the accumulation of the three of four hundred dollars out of which she now claims an allowance. But while we impute no blame for the sundering of this old connection, we do not see that the judge of probate erred in refusing an allowance under the circumstances."

With a few exceptions, this case is very similar to the case under consideration. These exceptions are that in the case at bar, it is not known that the separation was the fault of the husband, and it is not shown that the wife had for any great length of time, known the whereabouts of her husband. Yet it is probable, if it had not been for the purpose of getting some money from him, she never would have come to America.

While Amelia Roth never wedded again, she did that which was worse, in assuming improper relations, which resulted in the birth of two illegitimate children.

I am not sure but that the case at bar is a stronger case against the legal

widow than the case of Kersey v. Bailey, 52 Me., 201, just quoted from.

In Spiers' appeal, 26 Pa., 233, the intestate died at Philadelphia on the 10th day of June, 1853. He left a widow, Anna M. Spiers, surviving him, who, at the time of his death, was living in the city of Gottingen, Hanover. Spiers had been in this country about fifty years. A short time before his death he had written to her to join him in this country, which she promised by letter to do. In the mean time Spiers died, and his property was taken possession of by an administrator, and converted into cash, after which Mrs. Spiers arrived in this country, and she claimed her $300.00 for a year's allowance. This was done under a law of that commonwealth.

In the opinion the court says:

"That act was designed to prevent the family of a decedent from being deprived of a home immediately upon his death, and the property which the law exempts is to be retained by the widow. Neither the intention nor the language of the act apply to the case of a wife who has lived in a foreign country for years, separated from her husband, and never formed a part of his family here."

In a recent case in the same court, where the husband and wife married in Canada in 1873, and lived together four or five years, during which time three children were born to them, and he abandoned them in 1881, and went where they knew not.

In two or three years he wrote to his wife, requesting her to meet him in Hamilton, Province Ontario. She did, and they were reconciled. About the 1st of October, 1884, he left for the States with an understanding that he would secure a home for her and she should remain until he sent for her. He occasionally wrote until November, 1884, after which she heard nothing from him. Neither did she know at any time where he was. In fact he settled in Lancaster, Pa., in 1888, and in 1889 he married another woman who lived with him there until the 28th day of August, 1893, when

he died. His first wife was never divorced. She had been supporting herself for several years in Pennsylvania.

In the opinion the court says—"All the evidence points to the conclusion that the appellee was a devoted wife and mother. There was no time after his departure in 1884 that she would not have gladly welcomed a redemption of his promise, and rejoiced in a re-united family. It was no fault of hers that she was not a member of his household at the time of his death. It was his illegal acts and bad faith that excluded her from it.

"In contemplation of law the family relation still existed and his domicile was hers. Why then should she be denied the exemption which the law allows the widow? Surely a refusal of her claim for it must have something more to rest upon than his repudiation of his marital vows and duties.

"The only case which seems to lend some support to the appellant's contention is Spiers appeal, 26 Pa. S., 233.

"In that case the wife lived in a foreign country, and never formed a part of her husband's family here. There is nothing in the report of the case explanatory of their apparent separation, nor anything which suggests that he deserted her. All that appeared was the bare fact that she did not come to this country with him or while he lived, although his home was here for nearly five years before his death. The case cannot therefore, be regarded as an authority for the proposition that a husband's causeless and wilful desertion of his wife constitutes a bar to her claim for the exemption of 1851.

"In the subsequent cases in which the claim was disallowed on the ground of a severance of the family relation, the separation was the voluntary act of the wife, the result of her misconduct, or founded upon an agreement for alimony, and a release of all her claims upon the husband's estate."

Grier's estate, 30 Att. 727.

This case is important as showing that where the separation was the voluntary act of the wife, the result of her misconduct, or founded on agreement for alimony, or a release of all her claims upon the husband's estate, she will not be entitled to claim the year's allowance.

All these cases recognize that the establishment of the mere fact that the marriage relation once existed and was never legally severed, will not be sufficient to establish the widow's claim to the year's allowance. The claimant must show in addition that the marriage relation actually existed at the time of the decedent's death, or if it did not exist, that it was against her wish and without her fault.

Measured by these rules what is the result in the case at bar? Was the separation, and the continued severance of the marriage relation without Amelia Roth's consent? There is nothing to show such to be the case.

She never made any effort to find him or resume marital relations. When she did find him she brought a suit for alimony. No where do we find her showing any signs of sorrow at the separation, or any desire to again live as the wife of William Roth. She did not write to her husband. When she signed the contract hereinbefore referred to, she did not say anything, which showed that she thought he left her against her wish. From all the circumstances, I cannot say that the separation and the continuance of the same was against her wish or consent. Was the separation without her fault?

It is shown that she caused some trouble about living at the domicile provided by the husband, and threatened to or did leave him several times before he left her. Whether she was virtuous all the time is not known, but we do know that within a few years after her husband came to America she bore children who could not claim Wm. Roth as father. By this act she certainly gave recognized grounds for a legal separation.

There is no evidence that at any time she was a good, faithful wife to Wm. Roth. It may have been from the immoral acts and tendencies of Amelia Roth that her husband deserted her and came to America. As a rule virtuous married women do not readily become immoral.

There is something all through this matter that strongly suggests that Amelia Roth recognized that the separation was largely her fault. William Roth married here and provided well for his American wife and family. He was not licentious, or quarrelsome, but moral, kind and industrous, and it is hard to escape the thought, that if Amelia Roth would have been a good, faithful wife, he would not have deserted her. I cannot find that the separation and its continuance was without her fault. And in the absence of the contract she made with William, I believe she would still not be entitled to the year's allowance, as the widow of William Roth.

In the case of the estate of Wm. Hough in this court it was held that where there was a minor child, a contract could not be made barring a widow from claiming a year's allowance.

But in the same case it was intimated that where there was no such child, she could make such contract. And such is probably the law.

Having found on other grounds that Amelia Roth is not entitled to such allowance, this matter need not further be considered, except to say that I am rather of the opinion that, taken in consideration with her continued separation, return to Germany, with no minor child, the contract between Wm. Roth and Amelia is sufficient to bar her of her year's maintenance.

It was desired by parties that the court also express an opinion whether Amelia is barred of dower in William Roth's real estate, and distributive share of the personalty.

To my mind, Amelia Roth having died before assignment of dower, the same cannot now be enforced.

Our statutes make no provision for any one bringing a suit to assign dower, except a widow or a widower. Provision is made if the widow or

widcwer die after the suit is commenced that it may be continued in the name of the administrator. But the bringing of such suit by an administrator is not prcvided for by statute or sustained by the principles of the common law, for reasons so palpable in the law of dower not to require further discussion here.

I am also of the opinion that the contract or release signed by Amelia Roth, is a bar to her right to a distributive share of the personalty of the decedent.

J. L. Zimmerman, for Amelia Roth.

